IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Siemens Energy, Inc., a Delaware corporation, | ) | No: 1:19-cv-11302 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT** |
| | ) | |
| Babcock & Wilcox SPIG, Inc., a New Jersey corporation, f/k/a SPIG USA, Inc., | ) | (Jury Trial Requested) |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Siemens Energy, Inc. ("Siemens"), by and through its attorneys, BOWMAN AND BROOKE LLP, for its Complaint against Defendant Babcock & Wilcox SPIG, Inc. f/k/a SPIG USA, Inc. ("SPIG"), states and alleges with knowledge respecting its own actions and otherwise upon information and belief, as follows:

## INTRODUCTION

1.      Siemens brings this action based on breach of contract, common law conversion, statutory civil theft, unjust enrichment/constructive trust, and negligent bailment against SPIG arising out of the El Campesino Project, a project for which Siemens was to design and supply equipment and materials, and to provide services, for a power plant located in Chile.

2.      SPIG received millions of dollars from Siemens for its Work in connection with the El Campesino Project, of which a large percentage was payment for materials, supplies, and equipment. SPIG retained possession of these materials, supplies and equipment, and SPIG now informs Siemens that it was all "fully dispositioned" with the exception of what SPIG claims constitutes "$891,191.00" of the materials, supplies and equipment it was storing for Siemens.

3.      Siemens entered into a September 28, 2016 contract relating to Purchase Order No.

1

4500734528 with SPIG under which SPIG would provide certain defined "Work," which would include the supply of an air-cooled condenser and fin-fan cooler, for the El Campesino Project, among other Work (the "Agreement").

4.      On January 31, 2017, after Siemens paid SPIG millions of dollars for procuring approximately 90% of the materials, supplies and equipment for SPIG's Work under the Agreement, Siemens issued a Suspension Notice, as expressly allowed under the Agreement, temporarily suspending SPIG's Work under the Agreement.

5.      Pursuant to the Agreement between Siemens and SPIG, title to the materials, supplies and equipment purchased by SPIG, and paid for by Siemens, had passed to Siemens although Siemens had yet to take delivery of those items. During the suspension period, SPIG was contractually required to store these materials on behalf of Siemens, and was paid by Siemens for its storage and related costs pursuant to the Agreement.

6.      During this suspension period, SPIG and its parent company, Babcock & Wilcox Enterprises, Inc. ("Babcock & Wilcox"), experienced severe financial distress raising significant issues regarding whether they could continue as going concerns. These issues are well-documented in filings with the U.S. Securities and Exchange Commission ("SEC").

7.      SPIG informed Siemens during a January 9, 2019 meeting in Orlando, Florida that it would not make a profit on its Work relating to the El Campesino Project, and despite direction from Siemens to continue performing under the Contract, it unilaterally purported to terminate the Agreement, allegedly for "Siemens' convenience," on or about May 31, 2019.

8.      SPIG "scrapped," sold or otherwise disposed of millions of dollars of Siemens' materials, equipment and supplies without Siemens' express authority or permission, and failed to provide Siemens with the proceeds of those transactions.

2

9.      In addition to SPIG's unauthorized scrapping, selling or other disposition of Siemens' property, SPIG now claims, based on its unilateral, unauthorized and purported termination of the Agreement, that it is entitled to a cancellation fee measured in the millions of dollars.

10.      Siemens brings this action to secure a money judgment against SPIG for its breaches of contract and to seek equitable relief whereby the proceeds of SPIG's scrapping, selling, or otherwise disposing of Siemens' materials, supplies, and equipment will be placed in a constructive trust held by the Court awaiting entry of a final judgment in this action.

## THE PARTIES

11.      Siemens Energy, Inc. is a U.S. based subsidiary of a company that develops and builds power plants and power-generating components.

12.      Siemens Energy, Inc. is a Delaware corporation with its principal place of business in Orlando, Florida, and is therefore a citizen and resident of the State of Delaware and the State of Florida.

13.      Babcock & Wilcox SPIG, Inc. ("SPIG") is a global provider of custom-engineered cooling systems and services, including cooling solutions and aftermarket services to the power generation industry. SPIG is a 100% owned subsidiary of Babcock & Wilcox.

14.      SPIG is a New Jersey corporation with its principal places of business in San Diego, California or Barberton, Ohio, and is therefore a citizen and resident of the State of New Jersey and either the State of California or the State of Ohio.

## JURISDICTIONAL STATEMENT

15.      The Agreement between Siemens and SPIG provides that "[a]ll other claims of a Party [(*i.e.*, claims for more than $2.0 million)] shall be subject to the sole and exclusive

3

jurisdiction of the Federal District Court for the Southern District of New York, New York, United States of America." (Agreement at 28, Art. 33.) Siemens' claims in this action exceed $2.0 million.

16.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity of citizenship exists between Siemens and SPIG because Plaintiff is deemed a citizen of Delaware and Florida, while the Defendant is deemed a citizen of New Jersey and either California or Ohio.

17.     Venue is proper in this District under 28 U.S.C. § 1391(a)(3) because, due to the parties' Agreement, there is not a district in which an action may otherwise be brought as provided in 28 U.S.C. § 1391, and the Southern District of New York is a judicial district in which Defendant is subject to the Court's personal jurisdiction with respect to this action by virtue of the parties' stipulation that "the sole and exclusive jurisdiction" shall be in "the Federal District Court for the Southern District of New York."

## FACTUAL ALLEGATIONS

### A.     The Agreement.

18.     A true and correct redacted copy of the September 28, 2016 Agreement between Siemens and SPIG concerning the El Campesino Project and Purchase Order No. 4500734528 will be produced in discovery once an appropriate protective order is issued. SPIG was the "Seller" and Siemens was the "Buyer" under the Agreement.

19.     Pursuant to the Agreement, SPIG was to provide "Work" which generally related to supplying an air-cooled condenser and fin-fan cooler for the El Campesino Project. Under the Agreement, the term "'Work' shall mean all activities engaged in, by or on account of Seller [(*i.e.*, SPIG)] for the design, Supply and Delivery of equipment, Services and all other obligations and activities of Seller required in accordance with this Agreement." (Agreement at 3, Art. 1.)

4

20.     In general, pursuant to Article 4 of the Agreement, "[f]or and in total consideration of the supply of the Work by [SPIG] . . . [Siemens] agree[d] to pay [SPIG] ***the Agreement Price . . .*** for the equipment, materials and services," which measured in the millions of dollars. (*Id.* at 6, Art. 4, emphasis added.)

21.     Siemens and SPIG's Agreement also contained terms concerning the provision of an Irrevocable Standby Letter of Credit to be provided as security for SPIG's obligations under the Agreement. (*Id.* at 6, Art. 6 and Appendix 5.)

22.     A true and correct redacted copy of the October 19, 2016 "Irrevocable Standby Letter of Credit" provided by SPIG in an amount that exceeds $1.0 million will be produced in discovery once an appropriate protective order is issued.

23.     The Agreement expressly provides that "Siemens shall be entitled to draw down upon the letter of credit in the event . . . Seller fails to perform its obligations under the Agreement[.]" (Agreement at 6-7, Art 6.)

24.     Each payment request by SPIG was required to be accompanied by a partial lien waiver and release signed by an authorized representative of SPIG, under which SPIG was agreeing that it was releasing, waiving, and discharging any rights to claims for payment, including but not limited to the lien rights it had against the powerplant being constructed, Siemens, the Project Owner, and others, arising out of or relating to that portion of the Work performed as of the date of the invoice(s) associated with each payment request. (*Id.* at 6, Art. 6 and Appendix 3.)

25.     Siemens and SPIG expressly negotiated and agreed that, "[u]nless stated otherwise in this Agreement, ***title to the Work shall be deemed transferred to [Siemens] as payments are made*** and in the same proportion as the cumulative payments bear to the Agreement Price." (*Id.* at 8, Art. 8(B), emphasis added.)

26. Additionally, SPIG "represente[d] and warrant[ed] that, to the extent permitted by applicable laws, ***[it] waive[d] and release[d] any and all*** liens, ***claims*** or rights of lien which it has or may have ***against [Siemens]***, Purchaser, Owner, the Facility or the Facility Site [hereinafter referred to as "Protected Party(ies)"] ***on account of labor, services, materials, or equipment furnished by [SPIG]*** pursuant to this Agreement" ***and*** agreed that it "***shall not*** file, ***claim*** nor register ***any preferential rights, attachments,*** liens, ***nor rights of retention***, (hereinafter collectively referred to as "Lien(s)"), and ***shall use best efforts to prevent any Lien from being*** filed, ***claimed*** or registered by any Supplier or Sub-supplier or ***by any employee, servant or agent of SPIG*** and/or Suppliers and/or Sub-suppliers [of SPIG,] ***against the property*** of the Protected Parties ***for any Work done or materials furnished under the Agreement***." (*Id*. at 9, Art. 8(E), emphasis added.)

27. Pursuant to Article 9 of the Agreement, SPIG retained the "risk of loss of the Work until delivered in accordance with th[e] Agreement" and "[r]isk of loss" remained with [SPIG] even after receipt of payment by [Siemens], or if [SPIG] [wa]s responsible for storing Work to be delivered under this Agreement." (*Id*. at 9, Art. 9.)

28. SPIG and Siemens contemplated at the time of entering into the Agreement that the El Campesino Project may be suspended. Accordingly, they included "**Article 17 SUSPENSION**" in the Agreement, which provides as follows:

> Buyer may, by written Notice, direct Seller to suspend all or any part of the Work for such period of time as may be determined by Buyer to be necessary or desirable for its convenience. If such suspension unreasonably delays the progress of the Work and causes additional expense or loss to Seller in the performance of the Work, not due to fault or negligence of Seller, the Agreement Price shall be adjusted on the basis of reasonable costs resulting directly from the suspension and are (a) for the purpose of safeguarding, storing and/or preserving the Work at the point of fabrication, in transit, at the Facility Site or other location directed by Buyer; (b) to compensate Seller for keeping, to the extent required in the Notice, its organization and equipment committed to the Work on a standby basis; (c) for the reasonable

costs associated with demobilization and remobilization; or (d) for completion of Work to a given stage, as directed by Buyer. The time of performance of the Work shall be extended for a time period necessary to overcome the effects of the delay, as mutually agreed by Buyer and Seller. The Agreement shall be modified in writing accordingly; provided, however, that any claim by Seller for an adjustment hereunder must be asserted within thirty (30) days from the date of a start order for resumption of Work.

(*Id.* at 19, Art. 17.)

29.     The Agreement contemplated that ***"[Siemens] may terminate th[e] Agreement for its convenience at any time by Written Notice whenever it determines such termination to be in its best interest."*** (*Id.* at 20, Art. 18(A), emphasis added.)

30.     The Agreement also contemplates that Siemens may terminate the Agreement based on certain enumerated events of default by SPIG. (*Id.*, Art. 18(B).)

31.     The Agreement did not contemplate, or provide any provisions allowing, termination of the Agreement by SPIG for its convenience, for Siemens' convenience, based on a default by Siemens, or otherwise. (*See generally*, Agreement.)

32.     Further, the Agreement imposes obligations on SPIG to provide indemnification and to save Siemens harmless from and against certain losses and liabilities. For example, Article 29(B) provides, in part:

> Seller [(*i.e.*, SPIG)] shall indemnify and save harmless Buyer [(*i.e.*, Siemens)], Purchaser and Owner from and against all losses, liabilities, claims or demands whatsoever (including without limitation, all costs, expenses and attorneys' fees), arising out of any personal injury (including death) or any damage to or loss or destruction of property, in any manner based upon, occasioned by, or attributable or related to performance under this Agreement whether by Seller, Supplier or Sub-supplier, any employee of Seller, Supplier or Sub-supplier, except where such injury to or death of persons or damage to or loss or destruction of property is due to the negligence of Buyer, Purchaser and Owner, their officers, agents or employees. * * * It is the intent of the parties hereto that, where acts or omissions, whether negligent or otherwise, which result in any loss, damage, expense or liability subject to indemnification are determined to be contributory, principles of comparative negligence will be followed and each party shall bear the proportionate share of any loss, damage, expense and liability attributable to that party's acts or

omissions.

(*Id.* at 26, Art. 29(B).)

33.     Article 33 of the Agreement includes provisions governing the resolution of disputes or claims. Pursuant to those provisions,  SPIG agreed to follow  strict notice procedures:

> ***Any intent to file claim(s) by Seller [(i.e., SPIG)] must be made within five (5) working days after knowledge of the event giving rise to such claim.*** Claims must be made by written Notice to Buyer [(*i.e.*, Siemens)]. ***Complete documentation for claim(s) shall be submitted as soon as practicable, but in any event no later than twenty (20) days after the initial Notice by Seller of such claim.*** After consideration  and review by Buyer, substantiated  claims will be implemented  by a Change Order to this Agreement. ***Failure of Seller [(i.e., SPIG)] to give such Notice of a claim or to submit the required substantiation within the time limits set forth above shall result in a forfeiture and waiver of the right of Seller for additional compensation of any kind*** or for adjustments  to the schedule.

(*Id.* at 27, Art. 33, emphasis added.)

34.     The Agreement's provisions  regarding resolution of disputes  also mandates that "***the Parties shall exercise their best efforts to arrive at an amicable settlement of any dispute which may arise between them with respect to this Agreement***." (*Id.*, emphasis added.)

35.     "Pending  final  resolution  of claims"  SPIG was contractually  obligated  under the Agreement to "proceed diligently  with performance  of the Agreement,"  even if the performance of the Agreement was to store materials and supplied belonging  to Siemens during the suspension of other Work under the Agreement. (*Id.* at 28, Art. 33.)

**B.     The Suspension & Related Contract Amendments.**

36.     On January 31, 2017, William  Cannavino  of Siemens engaged Mike Farrell  of SPIG in a conversation to inform SPIG regarding the suspension of the El Campesino Project. That conversation was followed by a formal written Notice of Suspension  pursuant to Article 45 of the Agreement which provided  in pertinent part, as follows:

## SIEMENS

Date: January, 31 2017
Mr. Mike Farrell
B&W SPIG, Inc.
9988 Hibert Street
Suite 102
San Diego, CA 92131

**Subject:**       Siemens Energy, Inc.
                Purchase Order No. 4500734528 and Agreement
                Dated: September 28, 2016
                For the Air Cooled Condenser and Fin Fan Cooler equipment

                **Project Suspension**

Dear Mr. Farrell:

       This communication shall be considered as a "Notice" under the Purchase Order that, effective immediately, with the exception of engineering, all Work under the referenced Purchase Order shall be suspended until further notice.

       The duration of the El Campesino Project suspension is expected to be in place for a period of approximately six (6) months.  Siemens will communicate with you regarding any future information concerning the suspension.  We direct you to notify your suppliers and sub-suppliers of the suspension and begin to prepare detailed information for Siemens regarding current committed costs, status of all work in progress and specific recommendations for storage, preservation and protection of the quality and integrity of all purchased equipment and materials related to the Purchase Order in your possession or in the possession of your suppliers and/or sub-suppliers.  Unless specifically agreed to in writing by Siemens, as of this date, with the exception of engineering, you should stop all work effort under the Purchase Order and refrain from placing any supplier purchase orders/agreements and communicate that same information to your suppliers regarding sub-suppliers.

       Engineering and design work shall continue until further notice in writing from Siemens. Documentation submittals according to the Master Document List for the Purchase Order shall continue in accordance with the agreed upon schedules.  Siemens will be contacting you in the next few days to discuss the exact status of engineering, any additional cost involved in proceeding with engineering and any engineering that may be prevented by this suspension notice.

       A significant amount of detailed effort is required near term to complete a comprehensive suspension plan for the Project and we need your assistance in preparing your part of that plan.  Siemens is ready to discuss and collaborate in good faith with you in the next days to successfully manage the above delay, elaborate a common action plan and mitigate the impacts on the Purchase Order.

       We at Siemens are confident that, with your support, we will work through this current situation as a Team.  Please feel free to contact me directly should you have any questions or need any additional information regarding this message.

37.     A true and correct copy of the formal Suspension Notice will be produced in discovery once an appropriate protective order is issued.

38.     On January 31, 2017, SPIG issued its Monthly Report required by Article 10 of the Agreement. The Notice of Suspension was referenced in a single paragraph and explained that

9

90% of the materials, supplies and equipment needed for its Work on the El Campesino Project had already been procured, as follows:

| Function | Percent Complete |
|---|---|
| Engineering | 83% |
| Procurement | 90% |
| Manufacturing | 14% |

39.     On February 2, 2017, William Cannavino sent a letter to Mike Farrell of SPIG informing him that the scope of the January 31, 2017 Notice of Suspension Letter would now also include engineering work.

40.     Thereafter, the parties entered into negotiations concerning the scope and impact of the suspension on the Agreement and signed "Contract Amendment No. 06" that amended the Agreement effective as of August 2, 2017.

41.     A true and correct redacted copy of "Contract Amendment No. 06" will be produced in discovery once an appropriate protective order is issued.

42.     Contract Amendment No. 06 provided that the "estimated duration" of the suspension would be "twelve (12) months beginning on January 31, 2017." (Contract Amendment No. 06 at 1.)

43.     Contract Amendment No. 06 generally provided for payment of "Suspension Costs" that reflected, for example: (i) SPIG's demobilization and remobilization costs; (ii) SPIG's suspension period management costs; and (iii) SPIG's costs related to storage and preservation of equipment and materials purchased prior to suspension, that resulted in an "Adjusted Agreement Price" that was measured in the millions of dollars. (*Id.* at 2.)

44.     For SPIG's suspension costs accruing after the effective date of Contract Amendment No. 06, the parties agreed SPIG would submit "an invoice and accompanying

10

reasonable and related documentation (including related timesheets and sub-supplier invoices) to Siemens" on "a monthly basis." (*Id.* at 3.)

45.     Thereafter, the parties entered into further negotiations concerning the scope and impact of the suspension on the Agreement and signed "Contract Amendment No. 07" that amended the Agreement effective as of September 6, 2018.

46.     A true and correct redacted copy of "Contract Amendment No. 07" will be produced in discovery once an appropriate protective order is issued. Appendix 1 to Contract Amendment No. 07 identifies materials, supplies and equipment Siemens paid SPIG to procure for the El Campesino Project, and whether they were reallocated pursuant to Contract Amendment No. 07 for use on the San Pedro project.

47.     Contract Amendment No. 07 provided generally that all Work should remain suspended "until further instructions are given" and there was a general understanding that this meant the El Campesino suspension period would be extended at least "through 31-Dec-2018." (Contract Amendment No. 07 at 1 and 2.)

48.     Accordingly, SPIG would continue to store materials, supplies, and equipment Siemens had paid for, but which remained in the custody and control of SPIG, during the suspension period. (*Id.* at 2.)

49.     The parties also agreed to additional suspension costs that could be invoiced by SPIG to Siemens for suspension period management costs and costs associated with the continued "storage and preservation of equipment and material purchased prior to Suspension" resulting in an Adjusted Agreement Price that was still measured in the millions of dollars. (*Id.* at 2-3.)

50.     The parties agreed that invoices for "the suspension activities and related costs" incurred would be sent by SPIG to Siemens on a monthly basis, with the exception of "Seller

suspension costs accrued from 01-Feb-18 to 31-Dec-18" which would be submitted on or before September 7, 2018. (*Id.* at 3.)

51.    The following day, September 7, 2018, Siemens issued a document entitled "Change to Purchase Order" to SPIG that related to Purchase Order No. 4500734528 confirming the changes made pursuant to Contract Amendment No. 07.

52.    A true and correct copy of September 7, 2018 "Change to Purchase Order" will be produced in discovery once an appropriate protective order is issued.

**C.    Economic Distress of SPIG and Its Parent Company, Babcock & Wilcox.**

53.    The 2018 Annual Report of SPIG's parent company, Babcock & Wilcox, highlights SPIG's struggle to continue as a going concern. It also provides context for SPIG's breach of its Agreement with Siemens, including improperly selling/scrapping or otherwise disposing of materials, supplies, and equipment paid for by Siemens.

54.    The 2018 Annual Report of Babcock & Wilcox filed on April 2, 2019 (the "Annual Report") repeatedly highlights the significant concerns of management that Babcock & Wilcox— and thus SPIG—will not remain a going concern. For example, Babcock & Wilcox candidly disclosed:

A.    "Management believes it is taking all prudent actions to address the *substantial doubt about our ability to continue as a going concern*, but we cannot assert that it is probable that our plans will fully mitigate the liquidity challenges we face." (Annual Report at 5, 38 and 52, emphasis added.)

B.    The "[d]ifferences between actual results and any future performance suggested in our forward-looking statements could result from a variety of factors, including the following: our ability to continue as a going concern; *our ability to obtain and maintain sufficient financing to provide liquidity to meet our business objectives, surety bonds, letters of credit and similar financing*; . . . *our ability to perform contracts on time and on budget, in accordance with the schedules and terms established by the applicable contracts with customers*; . . . and our ability to maintain the listing of our common stock on the NYSE." (*Id.* at 11-12, emphasis added.)

C.      " . . . if we are not able to timely, successfully or efficiently implement the strategies that we are pursuing to improve our operating performance and financial position and comply with the covenants under the Credit Agreement, ***we may not have sufficient liquidity to sustain operations and to continue as a going concern and we could be required to reorganize our company in its entirety, including through bankruptcy proceedings***." (*Id*. at 13, emphasis added.)

55.     The dire financial condition of Babcock & Wilcox directly impacts SPIG, a wholly-owned subsidiary of Babcock & Wilcox. For example, SPIG is a guarantor of substantial debt owed by Babcock & Wilcox to its lenders, and certain of SPIG's assets are pledged as first-priority liens as security for such debt. (*See* Annual Report at 55 and 119.)

56.     Babcock & Wilcox continued to disclose substantial doubts about its ability to continue as a going concern in its 2019 Third Quarter Report filed with the SEC on November 7, 2019 (the "Third Quarter Report"). For example, it disclosed:

> "Management believes it has taken and is continuing to take prudent actions to address the ***substantial doubt regarding our ability to continue as a going concern, but we cannot assert that it is probable that our plans will fully mitigate the liquidity challenges we face*** because some matters may not fully be in our control." (Third Quarter Report at 11, 47 and 58, emphasis added.)

57.     Further, Babcock & Wilcox disclosed in its 2019 Third Quarter Report that "[r]evenues in the SPIG segment decreased 70% . . . in the third quarter of 2019" and that "[r]evenues in the SPIG segment were down 47% . . . in the nine (9) months ending September 30, 2019 from . . . the corresponding period in 2018." (Third Quarter Report at 52.)

**D.      The January 9, 2019 Orlando Meeting.**

58.     The El Campesino Project continued in suspension after December 31, 2018. Siemens and SPIG decided to hold a meeting in Orlando, Florida to discuss both the El Campesino Project and the San Pedro project in light of SPIG's new leadership structure.

13

59.     On January 3, 2019, Dave Sanderlin of SPIG sent an email to Brian Pentti of Siemens concerning the meeting in Orlando, stating: "Our goal is [to] initiate contract cancellation of the El Campesino Project and resolve outstanding T&C issues on the San Pedro project."

60.     Representatives of Siemens and SPIG met in Orlando, Florida on January 9, 2019.

61.     SPIG's new management team informed Siemens that SPIG was losing money on the El Campesino Project, and requested that Siemens issue a Termination Notice with respect to the Agreement concerning the El Campesino Project.

62.     Siemens instructed SPIG's new management team that:

    A.      The Agreement between SPIG and Siemens concerning the El Campesino Project did not give SPIG the right to unilaterally terminate the contract.

    B.      Siemens would not issue a Termination Notice to SPIG until Siemens' customer issued a formal letter to Siemens canceling the El Campesino Project.

    C.      Siemens would not issue a Termination Notice to SPIG until after there was a resolution regarding whether materials, supplies and equipment on the El Campesino Project could be used on other projects, specifically including the Las Flores project.

63.     On March 6, 2019, John DiVitto, the U.S. Country Manager for SPIG, who attended the January 9th meeting in Orlando, sent a self-serving email to Brian Pentti of Siemens, directly contrary to Siemens' instructions at the January 9th meeting, stating: "To date, B&W SPIG has not received a formal cancellation notice for El Campesino. Please advise the effective date for the cancellation so that we can close this project and stop accumulating costs to Siemens['] account for material storage."

**E.      SPIG's Purported Termination of the Agreement—Incorrectly Alleging the Purported Termination was for Siemens' Convenience.**

64.     John DiVitto sent an email with an attached letter on April 29, 2019 to Bill Cannavino at Siemens, with a "cc" to Brian Pentti of Siemens, "to follow up" on "cancelling the

Purchase Order" associated with the El Campesino Project. Ignoring Siemens' specific instructions provided at the January 9th meeting, John DiVitto wrote, in part:

> As you know, this Purchase Order has been under suspension for several months, and no substantive work is currently underway aside from the storage and preservation of work in progress. In light of Siemens' failure to provide further instructions, *we will consider this Purchase Order terminated for Siemens' convenience effective as of May 31, 2019*, at which time all procured materials and work in process will be available for immediate disposition in accordance with any instructions we may receive from you. Should no instructions be received on or before May 31, 2019, then *any such materials will be scrapped or disposed of in a manner we deem appropriate, and the proceeds will be used to offset any outstanding costs associated with the suspension and termination of this Purchase Order*.

(Emphasis added.)

65.    A true and correct copy of John DiVitto's April 29, 2019 letter described above, that was attached to the April 29th email that he sent to Bill Cannavino and Brian Pentti of Siemens, will be produced in discovery once an appropriate protective order is issued. The Siemens' Legal Department was not copied on John DiVitto's April 29th email, and the April 29th email was not followed by registered or certified mail to Bill Cannavino, as provided for in Article 45 of the Agreement.

66.    SPIG did not discuss its letter with anyone at Siemens with authority to address the issues raised until after it unilaterally purported to terminate the Agreement and disposed of procured materials for which Siemens had fully paid SPIG and for which SPIG had signed lien waivers.

67.    The Agreement did not allow SPIG to terminate the Agreement (or Purchase Order No. 4500734528) for either its own convenience or for Siemens' alleged convenience.

68.    The requirements for amending, changing, or modifying the Agreement, as set forth in the Agreement (*e.g.*, Articles 42 and 43), were not satisfied and, thus, SPIG had no contractual

basis to purportedly terminate the Agreement, ignore Siemens' suspension notice regarding the El Campesino Project, or to dispose of Siemens' property without Siemens' express consent as manifested by a signed writing.

69.     The preconditions for terminating the Agreement set forth by Siemens in the January 9th meeting in Orlando had not been satisfied.

70.     At the time SPIG sent its April 29, 2019 letter, and as of May 31, 2019 when SPIG purported to terminate the Agreement, no valid SPIG invoices for the El Campesino Project were outstanding.

71.     To the extent claims or disputes existed arising between SPIG and Siemens, SPIG was required under the Agreement to give notice of intent to file claim(s) within five (5) working days after knowledge of the event giving rise to such claim, and to exercise "best efforts to arrive at an amicable settlement of any dispute which may arise between them with respect to . . . the agreement." SPIG did neither.

72.     Notice of such claims would have avoided the circumstances where SPIG unilaterally purported to terminate the Agreement for Siemens' alleged convenience.

73.     On September 5, 2019, Brian Hamilton of Siemens asked John DiVitto of SPIG by email: "I'm trying to get a full understanding of the inventory that you are holding for the subject PO [*i.e.*, the El Campesino Project)]—do you have a detailed spreadsheet for the inventory for the ACC and Fin Fan Cooler? I have a high level spreadsheet (attached), but am looking for details around sizes/beam shapes/lengths/materials for structural material and the state of manufacture (raw materials, partially assembled, fully assembled) for any of the fabricated items."

74.     John DiVitto responded on behalf of SPIG on September 12, 2019 explaining: "*[W]e are not holding any inventory from the El Campesino project.*" (Emphasis added.)

75.     Brian Hamilton responded to John DiVitto's email on behalf of Siemens the following day, September 13, 2019, informing SPIG: "We would like to arrange a visit of one of our expediters to conduct a physical inventory and inspect the materials prior to shipment. As a result, we are looking to understand where the hardware is currently being stored that is associated to the subject purchase order." SPIG never responded.

76.     Brian Hamilton and John DiVitto talked by phone on September 16, 2019. During the conversation, John DiVitto reiterated that SPIG no longer held any of Siemens' materials, supplies or equipment and referred to SPIG's April 29, 2019 letter.

77.     On September 20, 2019, Ajay Jajoo of Siemens sent a formal letter to John DiVitto explaining Siemens' position ("Siemens' September 20 Letter"). A true and correct redacted copy of Siemens' September 20 Letter will be produced in discovery once an appropriate protective order is issued.

78.     Siemens' September 20 Letter informed SPIG, in part, as follows:

A.      It confirmed previous communications that SPIG is not currently in possession or control of certain materials for the El Campesino Project that may have been sold, scrapped, or otherwise disposed of by SPIG starting in May 2019, and provided notice that Siemens viewed SPIG's actions as a "material breach of the Agreement."

B.      It reiterated that the Agreement does not give SPIG the right to unilaterally declare a purported termination for convenience.

C.      It reminded SPIG that its unauthorized disposal of Siemens' materials for the El Campesino Project, for which title had already passed to Siemens, was done with actual knowledge that Siemens was attempting to reallocate those materials for use on other projects—specifically including the San Pedro and Las Floras projects—and constituted conversion as well as a material breach of contract.

D.      It informed SPIG that Article 29 of the Agreement requires SPIG to indemnify Siemens for any loss of, or destruction of, Siemens' property.

E.      It demanded a full and detailed accounting of: (i) all materials subject to the

Agreement which remain in SPIG's custody or control; (ii) details concerning how and when SPIG disposed of materials no longer in its custody or control; and (iii) the value SPIG received for the materials no longer subject to SPIG's custody or control.

F.   It provided formal notice to SPIG that Siemens intends to draw on the Irrevocable Standby Letter of Credit unless SPIG fully cures its breaches and failure to perform within 30-days.

79.   As a result of SPIG's misrepresentation and misconduct concerning Siemens' materials, supplies and equipment, Siemens could not reallocate those items to the Los Flores project and thereby incurred damages.

80.   Understanding it had acted wrongfully and committed serious, material breaches of the Agreement by disposing of Siemens' property without proper authorization, John DiVitto responded on behalf of SPIG via letter dated October 4, 2019 ("SPIG's October 4th Letter"). A true and correct copy of SPIG's October 4th Letter will be produced in discovery once an appropriate protective order is issued.

81.   SPIG's October 4th Letter directly contradicts John DiVitto's previous statement that "*we are not holding any inventory from the El Campesino project*" and explained that "not all materials have been fully dispositioned." It also provided an incomplete and inadequate accounting that failed to address the questions raised in Siemens' September 20 Letter.

82.   Collectively, SPIG received millions of dollars in payment from Siemens for its Work in connection with the El Campesino Project, with most of that money constituting payment for materials, supplies, and equipment. SPIG retained possession of these materials, supplies and equipment, and SPIG now informs Siemens that it has all "been fully dispositioned" with the exception of what SPIG claims constitutes "$891,191.00" of the materials, supplies and equipment it was storing for Siemens.

## COUNT ONE
## BREACH OF CONTRACT/BREACH OF WARRANTY
### (Against SPIG)

83.     Siemens realleges and incorporates by reference the allegations contained in each of the preceding paragraphs.

84.     The September 28, 2016 Agreement entered into between Siemens and SPIG is a valid and enforceable contract.

85.     Siemens has fully performed its obligations under the Agreement.

86.     SPIG has unjustifiably failed and refused, and continues to unjustifiably fail and refuse, to perform its obligations owed to Siemens under the Agreement.

87.     SPIG has materially and repeatedly breached the Agreement by, for example and not by way of exclusion:

  A. Unilaterally purporting to terminate the Agreement, allegedly for Siemens' convenience.

  B. Failing to preserve and store Siemens' property (*i.e.*, materials, supplies, and equipment) that SPIG was contractually bound to store and preserve pursuant to the Agreement, as modified, by Contract Amendment No. 06 and Contract Amendment No. 07.

  C. Breaching Article 33's requirement that SPIG provide notice of its intent to file claims within five (5) working days after knowledge of the event giving rise to such claims, and failing to submit to Siemens the corresponding "[c]omplete documentation" for those claims within twenty (20) days after the initial notice of claims.

  D. Breaching Article 33's requirement that SPIG use its best efforts to arrive at an amicable settlement of any dispute which may arise with respect to the Agreement—specifically including but not limited to its claims for a cancellation payment and payment on allegedly unpaid SPIG invoices.

  E. Breaching Article 33's requirement that SPIG "shall proceed diligently with [its] performance of the Agreement"—including its contractual duty to preserve and store Siemens' materials, supplies and equipment—"[p]ending final resolution of claims."

21810800v1

F.     Claiming rights, title and/or interest in Siemens' property for which Siemens had fully paid SPIG and received lien waivers. (*See, e.g.,* Agreement at Article 8.)

G.     Breaching Article 15(C)(2) requiring SPIG to exercise the highest standards of professional knowledge and judgment and be in strict compliance with the requirements of the Agreement with respect to "any . . . service furnished by it."

H.     Failing to provide proof of insurance as required by Article 29 and, upon information and belief, failing to obtain the insurance coverages required by the Agreement.

I.     Failing to honor Siemens' demand for indemnification under Article 29 in Siemens' September 20 Letter.

J.     Breaching its duty under Article 14 "to provide diligent quality management for all phases of the Agreement," including the suspension phase.

K.     Breaching its duties under Article 13 of the Agreement relating to inspections and access to the facilities and records of SPIG and its suppliers.

L.     Breaching the implied covenant of good faith and fair dealing by, for example, engaging in the actions as described above in more detail.

88.     As a direct and proximate cause of SPIG's material breaches of the Agreement, Siemens has suffered and continues to suffer actual, direct, and consequential damages in an amount to be determined at the time of trial but which are reasonably believed to greatly exceed $75,000.

## COUNT TWO
## COMMON LAW CONVERSION
### (Against SPIG)

89.     Siemens realleges and incorporates by reference the allegations contained in each of the preceding paragraphs.

90.     Without permission or lawful authority, SPIG intentionally took and/or possesses property (*e.g.*, materials, supplies, and equipment) that rightfully belongs to Siemens, and has

deprived Siemens of the possession, use, and enjoyment of that property in a manner that is inconsistent with Siemens' ownership of the property.

91.      Siemens had paid SPIG in full for the property.

92.      Ownership in, and/or title to, the property had passed to Siemens as a result of, for example, Siemens' payments to SPIG and SPIG's signing of lien waivers in connection with each of those payments.

93.      The actions of SPIG with respect to Siemens' property as described above, includes but is not limited to, SPIG intentionally selling, scrapping and/or otherwise disposing of Siemens' property without Siemens' express authorization, and thereby acting with actual malice and/or reckless disregard of Siemens' rights and interest in that property because it intentionally exercised dominion and control over that property in a manner that was manifestly inconsistent with Siemens' ownership interests in the property.

94.      SPIG's disposition of Siemens' property to third-parties after having been expressly told that Siemens would be reallocating that property to other projects—if not used on the El Campesino Project—similarly demonstrates an intentional or reckless disregard for, and unlawful interference with, Siemens' rights and interest in that property.

95.      By way of example, SPIG's declaration in John DiVitto's September 12, 2019 email unequivocally stating, "we are not holding any inventory from the El Campesino project," further demonstrates SPIG's actual malice and/or intentional or reckless disregard of Siemens' rights to the property at issue.

96.      SPIG's October 4th Letter acknowledging that "not all material have been fully dispositioned" and then identifying "$891,191.00" as the allegedly correct "[d]isposition value" of such property, is a further example of SPIG intentionally exercising its dominion and control

21

over Siemens' property and wrongfully depriving Siemens of the possession, use and enjoyment of Siemens' property—and also wrongfully depriving it of the fair value of that property.

97.     By way of example only, Appendix I of Contract Amendment No. 07, signed by SPIG, provides a per unit price of $12,000 for "gearboxes." However, SPIG's October 4 Letter provides a total value for 26 of those gearboxes of only $7,980 (a per unit price of just $306.92); thus, SPIG undervalued those materials by approximately $304,000. The other six (6) line items of material identified in SPIG's October 4th Letter were also materially and purposefully undervalued by SPIG.

98.     Alternatively, SPIG was paid millions of dollars, for its alleged procurement of materials, supplies, and equipment that SPIG had not actually procured, based on fraudulent representations to Siemens that payment was due.

99.     Due to SPIG's actions as described above, SPIG has converted property belonging to Siemens, and Siemens has been and continues to be proximately damaged by SPIG's conversion.

100.    As a result of SPIG's misconduct and actions discussed above, including its actual malice and reckless disregard for Siemens' property rights, Siemens is entitled to recover, and hereby seeks, damages as allowed by law.

101.    Siemens is entitled to damages caused by SPIG's conversion in an amount to be determined at the time of trial but which are reasonably believed to greatly exceed $75,000.

## COUNT THREE
## VIOLATION OF FLORIDA'S CIVIL THEFT STATUTES
### (Fla. Stat. Ann. § 772.101, *et seq.*)
### (Against SPIG)

102.    Siemens realleges and incorporates by reference the allegations contained in each of the preceding paragraphs.

103.   SPIG's conversion of Siemens' property was done knowingly, for example, because SPIG had signed lien waivers and the Agreement signed by SPIG clearly states in Article 8 that: (A) SPIG waived and released any and all claims it has or may have against Siemens on account of labor, services, materials or equipment furnished as a result of the Agreement; and (B) SPIG shall not claim or register any preferential rights, attachments, liens or rights of retention against Siemens' property.

104.   The Agreement, including Contract Amendment No. 06 and Contact Amendment No. 07, demonstrate how SPIG originally obtained Siemens' property.

105.   SPIG acted with felonious intent in depriving Siemens of Siemens' own property as demonstrated, for example, by the facts pleaded above, as well as: (A) the fact that SPIG was suffering financially; (B) SPIG informing Siemens that it wanted the Agreement cancelled because the El Campesino Project was not profitable for SPIG, and then unilaterally purporting to terminate the Agreement knowing it was a violation of SPIG's duties, obligations and rights under the Agreement; (C) initially denying SPIG had any of Siemens' property remaining in its possession, and then offered to follow Siemens' instructions with respect to such property but only providing Siemens a "[d]isposition value" for the property amounting to "$891,191.00;" and (D) selling (or otherwise transferring) Siemens' property to third-parties, but then failing and/or refusing to pay the proceeds of those transfers to Siemens.

106.   SPIG permanently deprived Siemens of its right to possess, use and enjoy the majority of the property at issue by disposing of it by sale (or other transfer) to third-parties, or by scrapping it.

107.   SPIG has temporarily or permanently deprived Siemens of the right to possess, use and enjoy certain of Siemens' property as demonstrated by John DiVitto's initial September 12,

2019 email unequivocally stating, "we are not holding any inventory from the El Campesino project," and SPIG's October 4th Letter that: (A) subsequently admitted "not all [of Siemens'] materials have been fully dispositioned," (B) attached a chart purporting to identify those materials, and (C) unilaterally attributing a knowingly false and materially low "disposition value" for those materials and for which Siemens had already fully paid SPIG a substantially higher amount.

108.    The value of Siemens' property converted by SPIG is measured in the millions of dollars, and Siemens' estimated actual damages are reasonably believed to be higher than the value of the property SPIG converted.

109.    Before filing this action, Siemens made a written demand to SPIG for the treble damage amount Siemens is entitled to under the Florida Civil Theft Statutes.

110.    Siemens is entitled to recover its reasonable attorney's fees and court costs pursuant to the Florida Civil Theft Statutes and seeks to recover those items of damages in this action.

111.    As a direct and proximate cause of SPIG's violation of the Florida Civil Theft Statutes, Siemens has suffered and continues to suffer actual damages in an amount to be determined at the time of trial but which is reasonably believed to greatly exceed $75,000.

<div align="center">

**COUNT FOUR**
**UNJUST ENRICHMENT,**
**RESTITUTION & CONSTRUCTIVE TRUST**
**(In the Alternative to Count 1)**
**(Against SPIG)**

</div>

112.    Siemens realleges and incorporates by reference the allegations contained in each of the preceding paragraphs.

113.    Siemens trusted SPIG with millions of dollars worth of materials, supplies and/or equipment for the El Campesino Project to protect, preserve and store that property until such time

<div align="center">24</div>

as it could be used for the El Campesino Project or another project pursued by Siemens.

114.    SPIG promised to protect, preserve and store Siemens' property.

115.    SPIG violated the trust and confidence Siemens had reasonably placed in SPIG when SPIG acted unethically and wrongfully towards Siemens with respect to its actions and misconduct as described in detail above—which includes but is not limited to: (A) disposing of Siemens' property by transferring it to third-parties when SPIG was aware Siemens wanted use those supplies, material and equipment on the El Campesino Project, or reallocate them for use on other projects; (B) withholding from Siemens the proceeds SPIG received when transferring Siemens' property to third-parties; and (C) falsely and materially undervaluing the "[d]isposition value" SPIG claims is attributable to Siemens' "materials" that have not yet "been fully dispositioned" and which remain in SPIG's possession, custody and/or control.

116.    Through the actions described in detail above, SPIG has been, and will continue to be, unjustly enriched to the detriment of Siemens in an amount that is reasonably believed to be measured in the millions of dollars.

117.    It is unjust and inequitable to permit SPIG to retain the benefits from its misconduct and wrongful actions, to the detriment of Siemens, as described in more detail above.

118.    Siemens had worked with SPIG on a number of past projects and had successfully trusted SPIG previously to safeguard and preserve millions of dollars of its property, including material, supplies, and equipment used in fabricating powerplants involved in those past projects.

119.    SPIG and Siemens understood their transactions with one another involved both a high degree of trust in one another as well as confidentiality with respect to many aspects of the projects on which they worked together, and this was true for the El Campesino Project.

120.   At all times that Siemens and SPIG worked together on the El Campesino Project, there was a separate, stand-alone International Nondisclosure Agreement and/or Confidentiality Agreement governing their relationship and demonstrating their trust for one another.

121.   SPIG has knowingly received and retained money from the unauthorized sale, transfer, scrapping and/or other disposition of Siemens' property, that is described in more detail above, which SPIG in equity and good conscience must pay to Siemens.

122.   Additionally, SPIG is now unfairly and illegally holding certain of Siemens' property hostage that has not yet been "fully dispositioned" and unilaterally attributing a false "[d]isposition value" to that property while knowing its true value is much greater than accounted for in SPIG's October 4th Letter.

123.   Upon these facts, Siemens is entitled to an immediate constructive trust imposed by the Court on all the proceeds SPIG received from its wrongful disposition of Siemens' property, and an order prohibiting any further transfers of Siemens' property to anyone other than Siemens.

124.   Equity and justice mandate that SPIG be required to reimburse or otherwise compensate Siemens fairly and equitably, *i.e.*, provide restitution, in an amount to be determined at the time of trial but which is reasonably believed to exceed $75,000.

**COUNT SIX**
**NEGLIGENT BAILMENT**
**(Against SPIG)**

125.   Siemens realleges and incorporates by reference the allegations contained in each of the preceding paragraphs.

126.   Siemens reasonably entrusted SPIG with the care, possession, preservation and storage of millions of dollars in materials, supplies, and equipment for the El Campesino Project.

127.    SPIG, or its designees, had the sole, exclusive, and actual possession, custody and control of Siemens' property as discussed in detail above.

128.    SPIG breached its duty of care with respect to Siemens' property and now cannot return it and cannot satisfactorily account for, or explain, its loss.

129.    As a direct and proximate cause of SPIG's breach of duty as a bailee, Siemens has suffered damages and will continue to suffer actual, direct, and consequential damages in an amount to be determined at the time of trial but which are reasonably believed to greatly exceed $75,000.

## DEMAND FOR A JURY TRIAL

Siemens demands a jury trial for all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Siemens Energy, Inc. prays for judgment in its favor and against Defendant Babcock & Wilcox SPIG, Inc., as follows:

1.    Awarding Plaintiff a judgment against Defendant in an amount greater than $75,000, the exact amount to be proven at trial;

2.    Ordering SPIG to provide an immediate and full accounting of Siemens' materials, supplies and equipment that SPIG was contractually obligated to preserve and store on Siemens' behalf, including, but not limited to: (A) an itemization of all such property that remains in SPIG's custody and/or control; (B) an itemization of what was sold, scrapped and/or otherwise disposed of, which includes: (i) the identity of the individuals and entities to whom the property was transferred, (ii) what was exchanged (*e.g.*, money) for each transfer, and (iii) the current location of the proceeds of each such transfer; and (C) the identity of each person that directed, authorized, participated in, or ratified each transfer of Siemens' property;

21810800v1

3.      Awarding treble damages as allowed pursuant to the Florida Civil Theft Statutes;

4.      Awarding attorney's fees as allowed by law, including the Florida Civil Theft Statutes and/or the Agreement;

5.      An order creating a constructive trust in the proceeds from all sales (or other transfers) of Siemens' property by SPIG, and requiring SPIG to pay that amount into Court;

6.      An order prohibiting SPIG from transferring any additional property belonging to Siemens to any other party without the express written permission signed by an authorized representative of Siemens or as ordered by the Court;

7.      An order allowing Siemens to pay into Court the funds it obtains (if any) from drawing down on the Irrevocable Standby Letter of Credit provided by BNP Paribas on behalf of SPIG and in favor of Siemens, to be held by the Court until such time as any dispute regarding such funds is resolved by the Court or the present action is dismissed, in which case the funds will be disbursed to Siemens and/or SPIG either as directed by a Court Order or pursuant to a stipulation signed by both Siemens and SPIG;

8.      Awarding Plaintiff pre-judgment interest;

9.      Awarding Plaintiff post-judgment interest on the judgment as otherwise specified by controlling law; and

10.     Awarding Plaintiff such other relief as the Court deems just and equitable.


Dated: December 10, 2019                    **BOWMAN AND BROOKE LLP**


By: /s/Christopher R. Carton
Christopher R. Carton (#CC408)
chris.carton@bowmanandbrooke.com
Erica S. Mekles (EM1020)
erica.mekles@bowmanandbrooke.com
317 George Street, Suite 317

21810800v1

New Brunswick,  NJ  08901
Telephone:  (201) 577-5196
Fax: (804)  649-1762

***ATTORNEYS FOR SIEMENS ENERGY, INC.***

21810800v1